# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Docket No. |
| Plaintiff, | |
| v. | |
| BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; BARCLAYS CAPITAL INC.; BNP PARIBAS SECURITIES CORP.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK, N.A.; FTN FINANCIAL SECURITIES CORP.; GOLDMAN SACHS & CO. LLC; JPMORGAN CHASE BANK, N.A.; J. P. MORGAN SECURITIES LLC; AND UBS SECURITIES LLC, | CLASS ACTION COMPLAINT JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police"), on behalf of itself and all others similarly situated, files this Complaint against Defendants (as defined below) for violations of the federal antitrust laws and common law unjust enrichment. Plaintiff's claims arise from Defendants' unlawful, anticompetitive scheme to fix, raise, maintain, stabilize, or otherwise manipulate the price of unsecured bonds issued by the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), which were sold and purchased throughout the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.      NATURE OF THE ACTION

1.      Fannie Mae and Freddie Mac issue unsecured bonds ("FFBs") to finance their operations in providing liquidity to banks and mortgage companies that make residential mortgage loans to consumers.

2.      Fannie Mae and Freddie Mac issue FFBs by selling directly to an exclusive, pre-approved group of banks ("Approved FFB Dealers") through a process referred to in this Complaint as the "FFB Issuance Process." After purchasing FFBs from Fannie Mae and Freddie Mac, Approved FFB Dealers actively buy and sell FFBs with investors in the $550 billion secondary market. Investors in the secondary market include U.S. institutional investors, mutual funds, hedge funds, and pension funds.

3.      Defendants are Approved FFB Dealers. From January 1, 2009 to April 27, 2014 (the "Class Period"), Defendants were the largest players in the primary market where Fannie Mae and Freddie Mac issued and sold FFBs. As a result, Defendants had control over the FFB supply ultimately available to investors. Defendants exploited that control to establish an opaque secondary market to facilitate collusion and reap supracompetitive profits at the expense of investors, including Plaintiff and the Class (defined below).

4.      The secondary market for FFBs is a vast "over-the-counter" ("OTC") market. Unlike stocks, FFBs are not traded on a national exchange. In order to buy or sell FFBs, an investor must typically communicate directly with a salesperson or trader employed by a dealer over computer networks and/or by phone to receive a price quote. An OTC market is therefore a dark market that enables a few select, knowledgeable, and privileged dealers to collude and harm investors—especially as compared to stock markets where investors are able to see pricing information updated in real-time as they trade.

5.      In a normally functioning secondary market, Approved FFB Dealers compete with each other for the purchase and sale of FFBs. Competition is primarily driven by the prices at which dealers are willing to buy and sell FFBs. Approved FFB Dealers typically quote bond prices to investors by providing them with their bid and ask prices. Generally, the smaller the "spread" (difference) between the "bid" (buy) and "ask" (sell) prices, the better and more competitive the prices are for customers.

6.      However, during the Class Period, rather than compete with each other, Defendants colluded to fix, raise, maintain, stabilize, or otherwise manipulate the prices at which they bought and sold FFBs in the secondary market.

7.      *First*, Defendants agreed to charge artificially inflated prices for newly issued FFBs during the week following a new issuance. Inflating prices after FFB issuances was lucrative for Defendants because a large volume of their FFB sales occurred in the week following an FFB issuance. Consequently, each Defendant had the common motive to inflate the prices of these products by charging agreed-upon, supracompetitive prices to investors after acquiring FFBs from Fannie Mae or Freddie Mac.

8.      *Second*, Defendants agreed to inflate the prices of older FFBs in the days prior to each new FFB issuance. This drove up the market price of new FFBs by establishing an inflated benchmark for comparison, allowing Defendants to earn excess, unlawful profits once they had new FFB inventory to sell.

9.      *Third*, throughout the Class Period, Defendants agreed to inflate the "ask" price at which they sold FFBs to investors and/or deflate the "bid" price at which they purchased FFBs from investors. That is, they agreed to widen the bid-ask spreads they quoted to customers, thereby increasing the prices investors paid for FFBs or decreasing the prices at which investors

sold the bonds. No dealer could widen its bid-ask prices unilaterally without losing trading business to its competitors. Thus, Defendants conspired with each other to widen the bid-ask prices—a sort of "safety in numbers" approach (albeit an illegal one).

10.     Observation of the bid-ask spreads that Defendants charged during the Class Period in comparison with the bid-ask spreads that Defendants charged after the Class Period shows that, after the Class Period, when Defendants' alleged conspiracy had ceased to operate, bid-ask spreads in the FFB market markedly decreased for no other apparent economic reason, which is consistent with an unlawful conspiracy amongst Defendants to fix bid-ask prices during the Class Period.

11.     Defendants' traders orchestrated and maintained their conspiracy via secretive communications, including telephone calls, electronic messages, and multi-bank electronic chatrooms. Through such communications, these traders discussed proprietary customer information and agreed upon the prices that they would quote to their investors for FFBs.

12.     The U.S. Department of Justice's Antitrust Division ("DOJ") is currently investigating Defendants' misconduct. In June 2018, *Bloomberg* reported that the DOJ had launched a criminal investigation into "whether traders manipulated prices in the $550 billion market for unsecured bonds issued by Fannie Mae and Freddie Mac."[1]

13.     Defendants' misconduct has injured U.S. investors who buy and sell FFBs. Defendants have inflated the prices at which they sold FFBs to investors and reduced the prices at which they purchased these products from investors, including Plaintiff and members of the Class. Thousands of U.S.-based investors have transacted hundreds of millions of dollars' worth

---

[1] David McLaughlin & Tom Schoenberg, *U.S. Opens Criminal Probe Into Trading in Fannie, Freddie Bonds*, BLOOMBERG (June 1, 2018), https://www.bloomberg.com/news/articles/2018-06-01/trading-in-fannie-freddie-bonds-is-said-to-be-probed-by-u-s.

of FFBs in the United States directly with Defendants. Plaintiff, on behalf of itself and all others similarly situated, seeks damages as a result of the unlawful conduct, trebled as provided by law, as well as restitution under unjust enrichment.

## II.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a). This Court also has supplemental jurisdiction for Plaintiff's state law claim under 28 USC § 1367.

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. § 1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

16.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.

17.     Defendants, either themselves or through their subsidiaries as agents, purposefully availed themselves of doing FFB business in the United States and in this District by, *inter alia*: (a) enacting their conspiracy here by charging artificial, agreed-upon prices in FFB transactions with investors in this District and throughout the United States; and (b) collecting unlawful overcharges from investors in this District and throughout the United States.

18.     In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this

District, and Plaintiff's claims arise out of Defendants' conduct. Defendants' FFB traders dealt directly with U.S.-based investors, buying and selling FFBs from and to them in a continuous flow of interstate and foreign commerce. Accordingly, Defendants' anticompetitive conduct had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

19.    The activities of Defendants were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

III.    **THE PARTIES**

20.    Plaintiff Oklahoma Police Pension and Retirement System is a defined benefit pension plan based in Oklahoma City, Oklahoma. Oklahoma Police provides retirement, death, and disability benefits and is overseen by a 13-member board of trustees. Oklahoma Police manages more than $2.5 billion in assets on behalf of more than 9,400 beneficiaries. During the Class Period, Oklahoma Police directly transacted in FFBs with several Defendants. As a direct and proximate result of Defendants' collusive and manipulative activities, Plaintiff was injured in its business or property.

21.    **Bank of America/Merrill Lynch**: Defendant Bank of America, N.A. ("BANA") is an American global bank and financial services company incorporated in Delaware and headquartered in Charlotte, North Carolina with operations in all 50 states. Bank of America Corporation, the parent company of BANA, completed its purchase of Defendant Merrill Lynch, Pierce, Fenner, & Smith, Inc. ("Merrill Lynch") on January 1, 2008 and continued operating its debt and equity underwriting sales and trading business after that date by merging Merrill Lynch with Bank of America Corporation's former broker-dealer subsidiary, Banc of America Securities LLC. Bank of America Corporation also assumed all liabilities and obligations of Merrill Lynch on October 1, 2013.

22.     Bank of America Corporation reports its financial position on a consolidated basis, which includes the activities of both BANA and Merrill Lynch. As of December 31, 2017, Bank of America Corporation held over $440 billion in debt securities, including FFBs. During the Class Period, Bank of America Corporation performed investment banking activities, including dealing FFBs to investors, through its wholly-owned subsidiary Merrill Lynch.

23.     Defendant Merrill Lynch is a wholly-owned indirect subsidiary of Bank of America Corporation and a corporate affiliate of BANA. Merrill Lynch is incorporated in Delaware, with its principal place of business in New York, New York. Merrill Lynch acts as a broker and a dealer in the purchase and sale of various financial instruments, including FFBs throughout the United States and in this District. It provides underwriting services and is registered as a broker-dealer and investment advisor with the SEC. Merrill Lynch is the primary broker-dealer for the Bank of America Corporation corporate family, including BANA, and prices, markets, and sells FFBs on behalf of BANA.

24.     As of December 31, 2017, Merrill Lynch held over $440 billion in U.S. Treasury and government agency securities, a category that includes FFBs. Merrill Lynch was an approved dealer for both Fannie Mae and Freddie Mac throughout the Class Period.

25.     Bank of America Corporation is responsible for internal controls, compliance, and oversight for both BANA and Merrill Lynch. It handles "Fixed Income Compliance," which includes monitoring and detecting unlawful conduct within Merrill Lynch's and BANA's sales and trading businesses, including Merrill Lynch's and BANA's FFB dealing activities.

26.     **Barclays**: Defendant Barclays Bank PLC, operating under the trade name "Barclays Investment Bank," is headquartered in London, England and provides investment banking advisory services, foreign exchange securities lending, and loan syndication services

through at least three offices in the United States, including its New York Branch located in this District. Barclays Bank PLC's macro market line of business is supported by trading desks that specialize in dealing FFBs. Barclays Bank PLC is a direct, wholly-owned subsidiary of Barclays PLC, a multinational financial services corporation.

27.     Defendant Barclays Capital Inc. ("BCI") is a wholly-owned subsidiary of Barclays Bank PLC, incorporated in the state of Connecticut, with its headquarters in New York, New York and domestic branch offices in at least 15 other U.S. cities. BCI is the main U.S. broker-dealer entity for the Barclays group of entities and is a U.S. registered securities broker-dealer with the SEC; a futures commission merchant, a commodity pool operator, a commodity trading advisor registered with the Commodity Futures Trading Commission ("CFTC"); and a municipal advisor registered with the SEC. BCI is registered as a "4(k)(4)(E)" securities subsidiary under the Bank Holding Company Act, which permits it to engage in securities underwriting, dealing, and market-making activities.

28.     BCI's activities include transactions in asset-backed securities, agency mortgage-backed securities, debt securities, other corporate related securities, equities, resale and repurchase agreements, securities lending and borrowing, and clearing derivative products. It is an approved dealer for both Fannie Mae and Freddie Mac, providing BCI access to FFB supply through the FFB Issuance Process. As of December 31, 2017, BCI held $8.5 billion in agency securities, a category that includes FFBs.[2] During the Class Period, BCI employees located in this District priced, marketed, and dealt FFBs to members of the Class.

---

[2] The terms "agency securities" and "agency bonds" are catch-all terms sometimes used to refer to debt instruments issued by agencies of the United States Federal government and entities sponsored by the Federal government, like Fannie Mae and Freddie Mac. These terms include FFBs.

29.    BCI performed its FFB business in the United States and in this District with the knowledge and consent of, for the benefit of, and under some control by Barclays Bank PLC as alleged below.

30.    BCI conducts FFB-related activities, including FFB dealing with investors, as part of Barclays Bank PLC's "Barclays Investment Bank" division. Barclays Investment Bank (which includes both Barclays Bank PLC and BCI) maintains a website in the United States where it advertises that "We serve our institutional investor clients by helping them to understand developments in global markets and offering execution and risk management tools across each major asset class." One of the ways in which Barclays Bank PLC serves its institutional investor clients is by transacting in FFBs with investors like Plaintiff through its wholly-owned subsidiary and main broker-dealer in the Barclays Investment Bank division, BCI. For example, Barclays Bank PLC wrote that Barclays Investment Bank "integrates our primary offering capabilities on behalf of issuer clients (*e.g.*, BCI's FFB underwriting activities in the FFB Issuance Process) with ***our*** secondary trading capabilities on behalf of ***our*** investor clients (*e.g.*, BCI's FFB transactions with investors including Treasury)" (emphasis added). These allegations show that BCI transacted in FFBs in the United States with the knowledge and consent of Barclays Bank PLC.

31.    BCI conducted FFB-related activities for the benefit of Barclays Bank PLC, including from its headquarters in this District. Barclays PLC, the ultimate parent of both BCI and Barclays Bank PLC, reports its results on a consolidated basis and describes its operations using the term "Barclays or Group" to refer to "Barclays PLC together with its subsidiaries." In its financial reports, Barclays PLC consolidates trading revenues generated by BCI and Barclays Bank PLC, including transactions in FFBs, in the entry "net trading income." Barclays PLC also

incentivized BCI employees to perform activities on its behalf, including trading in FFBs with investors, by establishing a share-based compensation plan that rewards BCI employees with shares of Barclays PLC stock based on performance.

32.     Barclays Bank PLC exercises control over BCI. For example, Gerard LaRocca is President of BCI, but is also the New York branch manager of Barclays Bank PLC's New York office. In mid-March 2012, Barclays Bank PLC reorganized BCI to absorb it into its Barclays Investment Bank division. Barclays Investment Bank is a division of Barclays Bank PLC that includes BCI's FFB-related activities. Barclays Investment Bank maintains a New York headquarters at 745 7th Avenue in New York, NY. BCI is headquartered at the same location in the same office. The Global Head of Market Risk, who is responsible for managing risk across all of Barclays Bank PLC's Barclays Investment Bank division, also manages market risk for BCI and is a Board Director of BCI. Edvard "Ed" Olsen is the Managing Director and Head of Compliance for Barclays Bank PLC's Barclays Investment Bank division, and is also the Chief Compliance Officer for BCI, demonstrating that Barclays Bank PLC exercises control of compliance and oversight functions for BCI. BCI staff report to senior managers in Barclays Bank PLC's Barclays Investment Bank division, who monitor their performance and make decisions concerning their compensation and advancement.

33.     Barclays Bank PLC also determines and publishes the terms that apply to BCI's FFB transactions with investors in the United States, further demonstrating Barclays Bank PLC's control over BCI's FFB trading and sales activities in this District and the United States.

34.     **BNP Paribas**: BNP Paribas S.A. ("BNPP SA") is one of the world's largest global banking organizations. It does business in 75 countries and employs over 180,000 people, including approximately 15,000 in the U.S. As of December 31, 2012, BNPP SA and its

subsidiaries held approximately €69 trillion ($90 trillion) government bonds, a category that includes FFBs. In the year 2012, it sold €93 trillion ($121 trillion) in government bonds, including FFBs.

35.     Defendant BNP Paribas Securities Corp. ("BNP Securities") is an indirect, wholly-owned subsidiary of BNPP SA, headquartered in New York, New York. BNP Securities is a registered broker-dealer with the SEC. It is BNPP SA's "main broker dealer" in the U.S., and it is its most significant subsidiary in terms of assets, revenue, head count, and capital.

36.     BNP Securities is a primary dealer in U.S. government securities and an approved dealer for both Fannie Mae and Freddie Mac. BNP Securities traded FFBs with investors in the United States from offices located in this District during the Class Period. BNP Securities' broker- dealer business is composed overwhelmingly of highly liquid assets, including U.S. Treasury securities and agency debt (a category that includes FFBs).

37.     BNPP SA manages internal controls, oversight, and compliance for BNP Securities. In this capacity, it is responsible for monitoring BNP Securities' activities and detecting violations of law, including by BNP Securities' FFB dealing business.

38.     **Citi**: Citigroup, Inc. is a global banking institution headquartered in New York, New York. It is the ultimate parent of its wholly-owned dealer-subsidiary, Defendant Citigroup Global Markets Inc. ("CGMI"). As of December 31, 2017, Citigroup Inc. reported that "fair value levels" of all "U.S. Treasury and federal agency securities" held by itself and its subsidiaries (including CGMI) was approximately $21 billion.

39.     CGMI is a New York corporation with its principal place of business in New York, New York. CGMI has been registered with the SEC since 1960 as both an investment adviser and a broker-dealer. CGMI currently has approximately 43,000 advisory accounts and

$22 billion USD in regulatory assets under management.[3] During the Class Period, CGMI dealt

FFBs to investors, including Plaintiff, from offices located in this District.

40.      Citigroup Inc. manages internal controls, oversight, and compliance for CGMI. In

this capacity, it is responsible for monitoring CGMI's activities and detecting violations of law,

including CGMI's FFB-related activities.

41.      As of June 18, 2018, CGMI reported that it has assets of approximately

$17 billion in U.S. Treasury and federal agency securities (a category that includes FFBs), and

over $20 billion in liabilities of the same.

42.      **Credit Suisse**: Defendant Credit Suisse AG ("CS AG") is a multinational banking

and financial services company which engages in banking, finance, consultancy, and trading

activities in the United States and worldwide. CS AG has a primary U.S. office located in New

York, New York referred to as "Credit Suisse AG, New York Branch." Credit Suisse AG, New

York Branch ("CS NY") is a legal and operational extension of CS AG in the United States and

is not a separately incorporated entity. CS NY is a primary dealer in U.S. government securities

and trades with the Federal Reserve Bank of New York in this District in agency debt, which

includes FFBs. Through its New York Branch, CS AG serves as a dealer in U.S. government and

agency securities, including FFBs.

43.      CS AG has direct and indirect subsidiaries based in the United States, including

Defendant Credit Suisse Securities (USA) LLC. CS AG is registered to do business in New York

with the New York State Department of Financial Services. As of October 2017, CS AG held

over $1 billion in FFBs.

---

[3] The SEC defines regulatory assets under management as "securities portfolios for which you provide continuous and regular supervisory or management services."

44.     Defendant Credit Suisse Securities (USA) LLC ("CS Securities") is a wholly-owned subsidiary of Credit Suisse AG, organized under the laws of Delaware with its principal place of business in New York, New York. CS Securities is a "Material Legal Entity" according to CS AG's latest U.S. Resolution Plan, described as the "U.S. broker dealer" and "main U.S. operating company" of CS AG. It is a U.S. registered broker-dealer, providing capital raising, market making, advisory, and brokerage services. It is an underwriter, placement agent, and dealer for money market instruments, mortgage and other asset-backed securities, as well as a range of debt, equity, and other convertible securities of corporations and other issuers. Until November 2017, CS Securities was a primary dealer in U.S. government securities. In November 2017, CS Securities transitioned its primary dealer license and a substantial portion of its U.S. Government and Agency Primary Dealership, secondary market trading, and repo market making to Credit Suisse AG, New York Branch. CS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB dealing inventory that it used in transactions with investors.

45.     CS AG manages internal controls, oversight, and compliance for CS Securities. In this capacity, it is responsible for monitoring CS Securities' activities and detecting violations of law, including CS Securities' FFB dealing activities.

46.     **Deutsche Bank**. Defendant Deutsche Bank AG ("DB AG") is a multinational bank that provides services in commercial banking, investment banking, and retail banking, as well as wealth and asset management products to corporations, governments, institutional investors, small and medium-sized businesses, and private individuals. DB AG engages in U.S. banking activities directly through its New York branch, which is based in this District. It also operates in this District through its U.S.-based subsidiaries including Deutsche Bank Securities

Inc. DB AG describes Deutsche Bank Securities Inc. as its "principal U.S. SEC-registered broker-dealer subsidiary." As of October 2018, DB AG held $361 million in FFBs.

47.     Defendant Deutsche Bank Securities Inc. ("DB Securities"), formerly known as Deutsche Banc Alex. Brown Inc., is a wholly-owned subsidiary of Deutsche Bank AG. It is incorporated in Delaware with its principal place of business in New York, New York. DB Securities is a registered securities broker-dealer and investment advisor with the SEC, a futures commission merchant with the CFTC, and a member of FINRA. DB Securities provides capital raising, market making, and brokerage services for its governmental, financial institution, and corporate clients. As of December 31, 2017, DB Securities held over $2 billion in U.S. Government agency obligations, a category that includes FFBs. DB Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory to trade with investors. During the Class Period, DB Securities employed trading and sales staff who priced, marketed, and dealt FFBs to members of the Class, including Plaintiff, from within this District.

48.     DB AG manages internal controls, oversight, and compliance for DB Securities and all other DB AG subsidiaries. In this capacity, it is responsible for monitoring DB Securities' activities and detecting violations of law, including by DB Securities' FFB dealing businesses.

49.     **First Tennessee**: Defendant First Tennessee Bank, N.A. ("First Tennessee") is a financial services company based in Memphis, Tennessee. It operates a large debt capital markets division that focuses on public issuers such as Fannie Mae and Freddie Mac and on trading and selling debt instruments to institutional investors such as Plaintiff and members of the Class. First Tennessee calls this division "FTN Financial Capital Markets."

50.     First Tennessee is registered with the SEC as a broker-dealer in government securities. As of December 31, 2012, First Tennessee and its subsidiaries, including FTN

14

Financial Securities Corp., held over $3 million in government agency securities, a category that includes FFBs. During the Class Period, either independently and/or through FTN Securities Corp., First Tennessee priced, marketed, and dealt FFBs to investors in this District during the Class Period.

51.     Defendant FTN Financial Securities Corp. ("FTN Financial") is a wholly-owned subsidiary of First Tennessee and operates as part of First Tennessee's FTN Financial Capital Markets division. It is one of the largest underwriters of FFBs and dealt FFBs to institutional investors.

52.     FTN Financial performed FFB business in this District with the knowledge and consent of, for the benefit of, and under some control by First Tennessee, as alleged below.

53.     Both First Tennessee and FTN Financial comprise First Tennessee's FTN "Financial Capital Markets division" and as such, conduct mutually beneficial FFB-related activities. First Tennessee acquires FFBs in the primary market by serving as an underwriter in the FFB Issuance Process. FTN Financial is described as "our capital markets business" on the Annual Report for First Tennessee and their mutual parent holding company, First Horizon National Corp. ("First Horizon"). In this capacity, FTN Financial provides FFB dealing services to investors, selling and trading FFBs acquired by First Tennessee. As described on the Annual Report, "FTN Financial provides a broad spectrum of financial services for the investment and banking communities through the integration of traditional capital market securities activities, loan sales, portfolio advisory services, and derivative sales."

54.     First Tennessee and FTN Financial operate as a single integrated unit, with operations by FTN Financial advertised under the same trade name and on the same website as First Tennessee. FTN Advisors is the trade name for wealth management products and services

provided by First Tennessee and its affiliates. The FTN Advisors website represents itself as an advisor and seller of agency bonds, a category that includes FFBs. The FTN Financial website advertises that, "whether it's providing mortgage trading, underwriting agency debt, providing customized portfolio strategies or more, we serve approximately 4,700 institutional customers in more than 50 countries." The FTN Financial website boasts that "we are backed by $2.9 billion in capital as a division of First Tennessee Bank, N.A., which we don't hesitate to put behind every underwriting in which we participate," indicating that First Tennessee consented to and benefits from FTN Financial's FFB-related business activities.

55.     First Tennessee reports its results on a consolidated basis, under its holding company, First Horizon, which uses the overarching terms "our" and "we" to describe First Tennessee and FTN Financial, with both explicitly listed as comprising "our core business." In its financial reports, First Horizon consolidates revenues generated by First Tennessee and FTN Financial.

56.     FTN Financial has a significant FFB-related business presence in this District. For example, its Research Division markets FFBs from offices located at FTN Financial's offices at 444 Madison Avenue, 9th Floor, New York, NY 10022.

57.     **Goldman Sachs**: Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a wholly-owned subsidiary of Goldman Sachs Group Inc., organized under New York Law with its principal place of business in New York, NY. Goldman Sachs is a registered broker-dealer with the SEC and trades financial products in all 50 states and the District of Columbia. It is registered with the CFTC as a futures commission merchant and a swap dealer. As of December 2016, Goldman Sachs held over $44 billion in U.S. government and federal agency obligations, a

category that includes FFBs. Goldman Sachs is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory.

58.     During the Class Period, Goldman Sachs employed FFB trading and sales staff based in the United States and in this District, who priced, marketed, and dealt FFBs to investors, including Plaintiff and members of the Class.

59.     Goldman Sachs Execution & Clearing, L.P. was a wholly owned subsidiary of Goldman Sachs Group, Inc. that offered trade execution and clearing services to other subsidiaries within the Goldman Sachs brand. Goldman Sachs Execution & Clearing, L.P. also executed FFB trades with Plaintiff and members of the Class at artificial prices during the Class Period, until it was acquired by Goldman Sachs in or around August 2017.

60.     **JPMorgan**: Defendant JP Morgan Chase Bank, N.A. ("JP MNA") is a wholly-owned "principal subsidiary" of JPMorgan Chase & Co., headquartered in New York, New York. It is a national banking association with branches in at least 23 U.S. states. As of February 2, 2018, JP MNA held over $1.7 billion in U.S. government agency and U.S. government-sponsored agency debt securities, a category that includes FFBs. During the Class Period, JP MNA traded FFBs with members of the Class from within this District.

61.     Defendant J.P. Morgan Securities LLC ("JPMS"), previously known as J.P. Morgan Securities Inc., is a Delaware limited liability company with its headquarters in New York. It is a wholly-owned and "principal" subsidiary of JPMorgan Chase & Co., which is also the parent company of JP MNA. JPMS is registered with the SEC as a broker-dealer and investment advisor and registered with the CFTC as a futures commission merchant. JPMS acts as a primary dealer in U.S. government securities, makes markets in FFBs, and clears OTC derivative contracts in connection with its corporate affiliates' market-making and risk

management activities. JPMS is an approved dealer for both Fannie Mae and Freddie Mac, providing access to FFB inventory through the FFB Issuance Process that JPMS and its affiliates, including JP MNA, use when dealing FFBs to investors. During the Class Period, JPMS dealt FFBs to members of the Class, including Plaintiff, from offices located in this District.

62.     On October 1, 2016, JPMS acquired J.P. Morgan Clearing Corp., which was known as Bear Stearns Securities Corp. until October 2008. J.P. Morgan Clearing Corp. offered execution and clearing services for corporations affiliated under the "JPMorgan" brand name, and, in that capacity executed FFB trades for members of the Class at artificial prices.

63.     JPMorgan Chase & Co. manages internal controls, oversight, and compliance for its subsidiaries including JP MNA and JPMS. In this capacity, it is responsible for monitoring JPMorgan Chase & Co.'s Fixed Income business unit, which encompasses JP MNA's and JPMS' FFB-related activities.

64.     **UBS**: UBS AG is a multinational banking and financial services corporation which engages in banking, financial, advisory, and trading service activities worldwide. It is headquartered in Basel, Switzerland. UBS AG maintains several branch and representative offices in the U.S. and is registered as a swap dealer with the CFTC. UBS AG reports that it conducts securities activities in the United States primarily through UBS Securities LLC. As of October 2018, UBS AG held over $304 million in FFBs.

65.     Defendant UBS Securities LLC ("UBS Securities") is an indirect, wholly-owned subsidiary of UBS AG with its principal place of business in New York, New York. It is a registered broker-dealer under the Securities Exchange Act of 1934 and is a member of the New York Stock Exchange, FINRA, NASDAQ, and other principal exchanges. UBS Securities

provides a full range of investment banking services, including trading and sales and prime brokerage operations.

66.     As of December 31, 2017, UBS Securities held over $5.7 billion in U.S. government and agency obligations, a category that includes FFBs. UBS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory through the FFB Issuance Process. During the Class Period, UBS Securities priced, marketed, and dealt FFBs to investors from offices located in this District.

67.     UBS AG manages internal controls, oversight, and compliance for UBS Securities. In this capacity, it is responsible for monitoring UBS Securities' activities and detecting violations of law, including by UBS Securities' FFB dealing businesses.

*        *        *        *

68.     Defendants Merrill Lynch, BCI, BNP Securities, CGMI, CS Securities, DB Securities, FTN Financial, Goldman Sachs, JPMS, and UBS Securities are approved dealers for debt securities issued by both Fannie Mae and Freddie Mac. During the Class Period, these Defendants had access to FFB supply through the FFB Issuance Process that is described below, which they used to acquire FFB inventory to deal to investors in the secondary market.

69.     Plaintiff and members of the Class purchased FFBs from Defendants and/or sold FFBs to Defendants in the secondary market during the Class Period.

IV.     **FACTUAL BACKGROUND**

**A.  Characteristics of FFBs**

70.     FFBs have core similarities that distinguish them as a single class of issuances.

71.     FFBs carry substantially similar levels of "credit risk." Although FFBs are not backed by the full faith and credit of the United States government, credit risk is low because Fannie Mae and Freddie Mac benefit from a perceived tie to the federal government as

institutions established by federal legislation. Accordingly, debt issued by Fannie Mae and

Freddie Mac generally has high credit quality. Investors typically were drawn to FFBs for their

safety and liquidity. FFBs are not perceived to be risky investments, and their returns to investors

reflect this fact. Investors did not bargain for the overcharges and underpayments that the

Defendant banks caused.

72.     FFBs are unregulated, unregistered over-the-counter issuances that are exempt

from registration and disclosure provisions of the federal securities laws.

73.     All Defendants operate trading desks that specialize in FFB trading and sales.

Within each Defendant's FFB sales and trading business, the same team that deals one type of

FFB to investors also deals all other kinds of FFBs. Thus, the same employees within each

Defendants' FFB trading and sales business determine the prices charged to investors in FFB

transactions for all types of FFBs.

74.     FFBs also have other common features, including face value, maturity, and

coupon payment. Collectively, these characteristics are used to determine an FFB's "yield to

maturity," which is the annual return that the holder of an FFB earns.

75.     The amount of money that Fannie Mae or Freddie Mac owes to the holder of an

FFB upon maturity is known as the "face value," and the length of time between when an FFB is

issued and when it matures is known as its "maturity." The most recently issued FFBs are known

as "on-the-run" FFBs, while all other, older FFBs with similar characteristics are known as "off-

the-run" FFBs.

76.     Most FFBs pay a fixed rate of interest or fixed coupon rate semi-annually. Some

FFBs pay a variable or floating coupon rate that adjusts periodically based on a designated index.

Fixed-rate FFBs have fixed interest rates and fixed maturities. If held to maturity, they preserve

their principal and offer certainty of cash flow. Prior to maturity, however, the market value of fixed-rate FFBs fluctuates with changing interest rates. In a falling-rate environment, market values will rise, creating the potential for capital gains. In a rising-rate environment, prices will fall, creating the risk of loss when securities are sold prior to maturity.

77.     Medium-term FFBs and long- term FFBs can also offer periodic interest payments known as "coupons."[4] FFB coupon payments occur semi-annually and are calculated by multiplying the interest rate specified for the FFB by the FFB's face value.

78.     Short-term FFBs, or discount notes, do not offer coupon payments. Instead, short-term FFBs are issued at a discount to face value.[5] The difference between the price paid and the face value due upon maturity represents the interest that the FFB purchaser earns in exchange for buying the short-term FFB.

79.     Most FFBs are non-callable or "bullet" bonds,[6] but Fannie Mae and Freddie Mac also issue callable FFBs that can be redeemed by the issuer prior to maturity.

**B.  FFB Market**

80.     The FFB market is structured as a three-tiered system with Fannie Mae and Freddie Mac at the top, Approved FFB Dealers in the middle, and investors like Plaintiff and the Class at the bottom.

81.     Fannie Mae and Freddie Mac issue FFBs several times a month, usually in a predictable pattern based on a pre-determined calendar.

---

[4] http://www.freddiemac.com/debt/products/mt-notes.html.

[5] http://www.freddiemac.com/debt/products/discount-notes.html.

[6] A bullet bind is a debt instrument whose entire principal value is paid all at once on the maturity date, as opposed to amortizing the bond over its lifetime. Bullet Bonds cannot be redeemed early by an issuer, which means they are non-callable. Because of this, bullet bonds may pay a relatively low rate of interest due to the issuer's interest rate exposure. *See,* https://www.investopedia.com/terms/b/bulletbond.asp.

82.     In the FFB Issuance Process, Fannie Mae and Freddie Mac issue FFBs using two methods. Most medium-term and long-term FFBs are issued in what is known as a "syndication." In a syndication, a subset of Approved FFB Dealers (known as a "syndicate") underwrites the FFB issuance together by agreeing to purchase the newly-issued FFBs from Fannie Mae or Freddie Mac.

83.     Fannie Mae and Freddie Mac also issue FFBs through private auctions. The only dealers who can purchase FFBs in auctions are Approved FFB Dealers.

84.     Approved FFB Dealers buy FFBs from Fannie Mae and Freddie Mac so that they can profit from trading FFBs with investors—including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments—in the secondary market.

85.     Investors generally do not participate in the FFB Issuance Process because Fannie Mae and Freddie Mac generally do not sell FFBs directly to investors. Rather, investors purchase and sell FFBs by transacting with Approved FFB Dealers in the secondary market.

86.     When underwriters sell new FFBs directly to Approved FFB Dealers for the first time on offer day before those FFBs are declared "free to trade," these sales are said to occur in the primary market. After a syndicate is terminated and the new issue is declared free to trade, secondary market trading has commenced. The secondary market also includes sales by investors to dealers of older issues that the investor has decided to sell rather than hold until maturity, and purchases by investors from dealers of such older issues.

87.     The DOJ Antitrust Division has launched an investigation into price-fixing by dealers in the FFB secondary market, as set forth in more detail below. The investigation

concerns collusion among dealers to fix the prices of FFBs that they traded with investors, such as Plaintiff and the Class, in the secondary market.

### C.  Defendants Controlled FFB Supply

88.    Defendants control the majority of the market for FFBs because they purchased a substantial portion of FFBs from Fannie Mae and Freddie Mac during the Class Period. As such, Defendants control a large portion of the supply for the secondary market of syndicated and auctioned FFBs. Defendants likewise handle the majority of the volume of older FFBs traded in the secondary market.

89.    During the Class Period, Defendants were among the 10 largest FFB underwriters in the United States. Each underwrote more than $28 billion in FFBs during the Class Period. Defendants had dominant control of FFB supply and were well-positioned to use their dominant position to fix the prices of FFBs charged to investors.

### TABLE 1

**Share of FFB Underwriting from March 1, 2010 through April 27, 2014**

| Defendant | FFBs Underwritten |
|---|---|
| BCI | $87 billion |
| UBS Securities | $58 billion |
| JPMS | $57 billion |
| DB Securities | $52 billion |
| CGMI | $51 billion |
| BNP Securities | $45 billion |
| CS Securities | $42 billion |
| First Tennessee National Bank Association | $38 billion |
| Goldman Sachs | $32 billion |

| Merrill Lynch | $28 billion |
|---|---|
| **Total Underwritten by Defendants** | **$486 billion** |
| **Total Underwritten** | **$759 billion** |
| **Defendants' share of FFB Underwriting** | **64.1%** |

90.     Data published by the Federal Reserve Bank of New York (the "FRBNY") further demonstrates that the FFB market is highly concentrated among the largest FFB dealers. The FRBNY published a report on transaction volume in the market for "agency debt securities" that breaks down the market share percentage for the top 10 dealers in the agency debt securities market.[7]  The report shows that the top 10 dealers by market share accounted for 98.90% of all reported transactions of non-coupon bearing agency debt securities, a category that includes short-term FFBs.

91.     The data also shows that the top ten dealers by market share accounted for 81.35% of all reported transactions of agency debt securities that pay coupons, a category that includes medium-term and long-term FFBs.

92.     This large concentration in the primary market gave Defendants control over the FFB supply available to investors in the secondary market. It also gave Defendants the ability to fix the prices that investors paid for FFBs. Defendants were also motivated to fix FFB prices to generate supracompetitive FFB trading profits.

---

[7] The NYFRB classifies FFBs as agency debt (https://www.newyorkfed.org/markets/domestic-market-operations/monetary-policy-implementation/agency-debt-securities).

### D.  Trading and Pricing of FFBs

93.     Defendants effectively established, maintained, and operated the secondary "over-the-counter" market for FFBs. Each Defendant operates a trading desk which both sell and trade FFBs to investors in the secondary market.

94.     The market price of an FFB at any given time is calculated by comparing the yield to maturity offered by the FFB with the yield offered by other, similar debt instruments. Investors and dealers in the FFB market often use U.S. Treasury securities as a comparison to determine FFB prices because U.S. Treasury securities are widely viewed as the lowest risk, most actively traded debt securities available to investors.

95.     Interest rates and bond prices have an inverse relationship. As interest rates increase, the prices of FFBs decrease to reflect the fact that an investor can earn a greater amount of interest by purchasing a new debt instrument at the higher prevailing interest rate. Conversely, as interest rates decrease, the prices of existing FFBs increase to reflect the fact that the amount of interest offered by the existing FFB is greater than the amount of interest an investor could earn by purchasing a new debt instrument at the prevailing interest rate.

96.     FFBs are OTC debt. Generally, employees at a trading desk within the Approved FFB Dealer's FFB business are responsible for determining FFB price quotes offered to investors. All Defendants operate trading desks that specialize in FFB trading and sales. Within that sales and trading business the same employees for each Defendant which deal with one type of FFB also deal all other kinds of FFBs. Thus the same employees are able to determine the price charged to their investor customers, like Plaintiff, for FFB transactions for all types of FFBs. The Approved FFB Dealer sends the price quote to the investor without disseminating the price quote to the investing public. Despite the vast size of the market, trades are typically conducted over the phone or by message, person to person.

97.     This feature of the market makes the FFB market opaque. Investors do not see FFB price quotes in real-time, and thus cannot evaluate prices quoted by multiple dealers without a substantial delay.

98.     As the largest Approved FFB Dealers, Defendants profit by dealing FFB inventory to customers in the primary and secondary markets. Approved FFB Dealers profit from trading FFBs with investors by keeping the difference between the price that the Approved FFB Dealer pays to purchase an FFB and the price at which the Approved FFB Dealer sells an FFB to a customer.

99.     Defendants typically quote FFB prices in the form of a "bid-ask spread." The bid price indicates the price at which the dealer is willing to buy a given FFB from a customer, and the ask price represents the price at which a dealer is willing to sell the same FFB to that customer. By buying at a lower price and selling at a higher price, Defendants profit off of the difference. The wider the bid-ask spread, the greater the profit for the Defendant in an FFB transaction and the higher the cost for the customer.

100.     Two factors affect the size of the bid/ask spread: (1) market liquidity and (2) market volatility. For example, as market liquidity decreases the size of the bid/ask spread widens, and the costs of participating in the market for consumers increases. The same is true for higher volatility when the broker faces more price risk and thus requires a higher compensation.

101.     In competitive OTC bond markets, dealers compete against each other by offering superior prices to customers in order to secure business. Competition keeps bid-ask spreads within a relatively narrow range, since any dealer that unilaterally quotes inferior prices to customers will lose business to competitors.

## V.   DEFENDANTS CONSPIRED TO FIX FFB PRICES CHARGED TO INVESTORS IN THE SECONDARY MARKET

102.   In a competitive secondary market, Defendants compete for customers seeking to buy and sell FFBs.

103.   However, rather than compete with each other for customers, Defendants entered into an illegal scheme to: (1) fix prices of newly issued FFBs in the week following each FFB issuance artificially higher; (2) fix prices for soon to be off-the-run FFBs artificially higher in the period leading up to a new FFB issuance; and (3) quote agreed-upon, artificially inflated bid-ask spreads to investors throughout the Class Period on all FFB transactions with investors.

104.   The economic facts show prices for FFBs throughout the Class Period strongly suggest a successful price-fixing conspiracy that inflated the prices investors paid when buying FFBs and deflated the prices investors received when selling FFBs throughout the Class Period.

105.   As a result of Defendants' illegal scheme, investors, including Plaintiff and the Class, paid supracompetitive prices for FFBs and/or received deflated prices on sales of FFBs and, as a result, suffered injury to their business or property.

### A.  Defendants Fixed the Prices of Newly Issued FFBs.

106.   In a competitive market, the difference between the price that Defendants paid to purchase FFBs during the FFB Issuance Process and the price that Defendants then charged to investors for these same FFBs should be especially small when Defendants' sales of newly issued FFBs are made on the same day that Fannie Mae or Freddie Mac issued the FFBs ("offer days"). For these sales, only a short amount of time has passed (*i.e.*, less than one day) between the time when the Defendants purchased the FFB from Fannie Mae or Freddie Mac and the time when it sells the same FFB to an investor. Thus, the impact of new information, such as changes

in prevailing interest rates, Fannie Mae's or Freddie Mac's creditworthiness, or liquidity is near zero.

107.    Pricing data for Fannie Mae Benchmark Notes and Freddie Mac Reference Notes[8] (collectively, the "Notes") represent over $400 billion of total FFB issuance and are among the most traded FFBs, accounting for over 2 million transactions out of 5.9 million total (33.9%) reported FFB transactions from March 1, 2010 through December 31, 2017. Defendants participated in underwriting 85.4% of these instruments from March 1, 2010 through April 27, 2014.

108.    The average difference between the price that Approved FFB Dealers paid to Fannie Mae or Freddie Mac for Notes and the price at which Approved FFB Dealers sold these Notes to investors on offer days from April 27, 2014 through December 31, 2017 was very small, averaging 0.4 cents.

109.    The average difference between the price that Approved FFB Dealers paid to Fannie Mae or Freddie Mac for Notes and the prices at which Approved FFB Dealers sold these newly issued Notes to investors on offer days before April 27, 2014 was far larger, averaging 3.2 cents.

110.    Thus, the prices that Defendants charged investors for newly issued Notes on offer days was eight times higher before April 27, 2014 than after. The substantial decrease in the prices of newly issued Notes after the Class Period would not have been observed in a market that was competitive throughout the Class Period.

111.    Regarding all FFBs issued after March 1, 2010, a significant difference between the price that Approved FFB Dealer Defendants paid Fannie Mae or Freddie Mac for FFBs and

---

[8] "Reference Notes securities are one of Freddie Mac's term debt products, offering investors fixed-rate debt from two through ten years." http://www.freddiemac.com/debt/products/reference-notes.html.

the price at which the Approved FFB Dealer Defendants sold these FFBs to investors both before and after April 27, 2014. Defendants charged significantly higher prices for newly issued FFBs sold to investors during the Class Period when compared to the period after April 27, 2014.

112.    In addition, an increase is observed in prices that Defendants charged for newly issued FFBs relative to the yields offered by U.S. Treasury securities with comparable maturities.

113.    The prices of U.S. Treasury securities are affected by the same macroeconomic factors and market conditions as FFBs. For example, changes in the credit condition of the U.S. federal government and prevailing interest affect FFBs and U.S. Treasury securities similarly.

114.    The inflated prices that Defendants charged for newly issued FFBs on offer days were highly abnormal as compared to the yields offered by U.S. Treasury securities of comparable maturities.[9]

### B.  Defendants Fixed the Prices of the Previously Issued FFBs Just Before They Went Off-the-Run to Create an Artificial Benchmark.

115.    Fannie Mae and Freddie Mac typically issue FFBs using a predictable, regular schedule. Newly issued FFBs of a given type generally have similar or identical features to existing FFBs except that they mature at a later date. Thus, the prices of newly issued FFBs are closely correlated with the prices of FFBs with similar characteristics that have been previously issued.

116.    This correlation between the prices of previously issued FFBs and newly issued FFBs with comparable features created an opportunity for Defendants' conspiracy to increase the market value of new FFB supply by inflating the market price of FFBs with similar features that were about to go "off-the-run."

---

[9] Looking at the difference between the price that each Approved FFB Dealer charged to investors for newly issued FFBs to the price that the same Approved FFB Dealer charged to investors for newly issued U.S. Treasury securities of a comparable maturity.

117.    After April 27, 2014, the prices of FFBs that were about to go "off-the-run" traded at lower prices than newly issued FFBs. This price difference occurs because the market for on-the-run FFBs is generally more liquid (*i.e.*, larger transaction volume) than the market for off-the-run FFBs. Investors prefer to invest in more liquid FFBs because an investor has a higher likelihood of finding a buyer for these instruments at the market price should the investor decide to sell. Because demand is higher for on-the-run FFBs than for off-the-run FFBs, prices of on-the-run FFBs are also generally higher.

118.    Thus, in a competitive market, demand (and therefore price) of FFBs that are about to go off-the-run should be relatively low in the days leading up to a new issuance of FFBs with similar features because investors would prefer to purchase FFBs from the new issuance.

119.    However, that is not what occurred on and before April 27, 2014. Notes that were about to go off-the-run exhibited an anomalous increase in price in the days leading up to a new issuance of Notes. Specifically, Notes about to go off-the-run consistently experienced a statistically significant price increase in the two days immediately leading up to a new issuance.

120.    A way to isolate Defendants' price inflation of Notes about to go off-the-run and account for any other potential macroeconomic factors is to compare the prices Defendants charged to their customers for these FFBs and the prices that Defendants charged to each other for the same Notes. This comparison shows that the price inflation for Notes about to go off-the-run only occurred in transactions involving ***customers***. In otherwise identical transactions between Defendants, no price inflation occurred.

121.    As with prices for newly issued Notes, price inflation for Notes that were about to go off-the-run dissipated beginning after April 27, 2014.

122.    Defendants' practice of charging inflated prices to their customers for FFBs that were about to go off-the-run while charging lower prices to their horizontal competitors provides further evidence of anticompetitive conduct.

**C.  Defendants Fixed Bid-Ask Spreads for FFBs at Artificially Wide Levels.**

123.    Defendants also agreed to charge inflated bid-ask spreads for FFBs that they traded with investors. This enabled Defendants to earn artificially inflated profits on all FFB transactions that they entered with Plaintiff and the Class throughout the Class Period, causing Defendants' customers to overpay or receive less money on every FFB transaction.

124.    In a competitive market, dealers compete by offering narrower bid-ask spreads to customers. If a dealer charges wider bid-ask spreads – by either lowering the bid price and/or raising the ask price – it should lose customers to rivals offering tighter spreads.

125.    When dealers agree to fix bid-ask prices, they conspire to artificially raise the bid when a customer sought a bid or lower the ask when a customer sought an ask, or both. Another method is to agree to offer a particular bid-ask quote (*e.g.*, 99.93/100.07 for FFBs) or agree to charge a minimum bid-ask spread (*e.g.*, 14 basis points). In all cases, the dealers are better off because they can guarantee a consistent profit margin on each transaction and avoid losing customers to competition from rivals who are willing to offer superior prices and narrower bid-ask spreads.

126.    As explained above, bid-ask spreads normally decrease as liquidity increases to reflect a lower liquidity premium. However, just the opposite occurred in the FFB market prior to April 27, 2014. As liquidity increased, bid-ask spreads became ***wider***. This is exactly the reverse of what occurs in competitive financial markets but makes sense in the context of Defendants' agreement to quote inflated bid-ask spreads. As liquidity increased, Defendants' ability (by providing more opportunities to quote fixed prices) and motive to profit (through

greater transaction volume) from inflating bid-ask spreads also increased. Defendants responded to greater liquidity by agreeing to maintain wider bid-ask spreads, thereby earning additional profits on each FFB transaction with customers as liquidity increased.

127.    The effect of Defendants' conduct on bid-ask spreads can be observed in the bid-ask spreads that Defendants quoted in "riskless principal" transactions. A riskless principal transaction is a trade where a dealer purchases an FFB after it has already agreed to sell the FFB to a customer or vice-versa, and therefore never bears any liquidity risk associated with carrying that FFB. Analyzing riskless principal transactions is useful for measuring the impact of Defendants' conspiracy on bid-ask quotes because these transactions are not impacted by liquidity premiums or changes in market conditions. During the Class Period, Defendants' bid-ask spread for FFBs was wider on average than bid-ask spreads for riskless principal transactions.

128.    The totality of economic analyses demonstrates that Defendants' behavior created an artificially wide bid-ask spreads quoted to investors, including Plaintiff and Class members, during the Class Period.

VI.    **DOJ INVESTIGATION INTO DEFENDANTS' CONSPIRACY**

129.    In June 2018, *Bloomberg* reported that DOJ was conducting a criminal investigation into collusion among dealers to fix FFB prices.

130.    The DOJ's investigation is looking into "whether traders manipulated prices in the $550 billion market for unsecured bonds issued by Fannie Mae and Freddie Mac."

VII.    **THE FFB MARKET STRUCTURE SUPPORTS THE EXISTENCE OF A FFB CARTEL**

131.    Fannie Mae and Freddie Mac monitored Defendants' performance in the secondary market and awarded underwriting privileges based on success in the secondary

market. This connection between the underwriting process and the secondary market gave Defendants a motive to conspire to raise and fix prices in the secondary market.

132.    OTC markets are susceptible to collusion among dealers for several reasons. Unlike in central exchange-based markets like the stock market, investors like Plaintiff and the Class lack access to real-time pricing data. This limited investors' ability to search for superior, non-cartel prices and enhanced the efficacy of Defendants' conspiracy.

133.    Because the FFB market is not a transparent market, Defendants were able to charge fixed prices without revealing their conspiracy to their customers.

134.    In an OTC market, customers typically contact only a limited number of dealers before transacting. Furthermore, the time required to navigate the OTC process provides dealers with the opportunity to communicate and collude with one another before an order is executed.

135.    In January 2018, the Treasury Market Practices Group ("TMPG") issued its latest set of recommendations for Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets. The stated goal of these best practices is to ensure integrity, transparency, efficiency, liquidity, and "vigorous competition" in the Treasury, agency debt, and agency mortgage-backed securities markets. The TMPG has issued best practice recommendations encompassing FFBs nearly on an annual basis since 2010.

136.    The TMPG best practices recommendations are an acknowledgement that the FFB market has opportunities for "illegal activities such as price manipulation," collusion, and anti-competitive conduct. This is evident from the enumerated practices and trading strategies it cautions against, including misuse of confidential information and manipulative practices such as

"painting the tape"[10] (*i.e.,* a form of market manipulation whereby market players attempt to influence the price of a security by buying and selling it among themselves to create the appearance of substantial trading activity.).

137.    Defendants who engaged in any of these forms of market manipulation would have been able to buy at a lower price or sell at a higher price than they otherwise would have been able to. Further, Defendants' access to trade data provided Defendants a mechanism to monitor compliance with their price-fixing agreement by checking other cartel members' FFB transactions.

138.    The FFB traders and sales personnel at Defendants' respective offices had well-established relationships. They worked together regularly, over an extended period, as a small group of traders and salespeople operating in the same markets. Defendants' FFB traders and sales personnel were well-acquainted with each other and had pre-existing relationships based on time spent working together within one of the Defendant's FFB business.

139.    Defendants also had the ability to use secretive communications, such as telephone calls, private electronic messages, and multi-user electronic chat rooms, to maintain their collusive price-fixing scheme and coordinate in real time to share proprietary customer information and align their pricing.

140.    Other aspects of the FFB market also make it highly susceptible to collusion. There is a high level of industry concentration in the FFB market. Defendants are a small number of competitors who controlled the supply of FFBs.

141.    There are high barriers to entry into the FFB market. It is expensive to become an Approved FFB Dealer, and few banks can bear the costs and risks associated with carrying

---

[10] *See https*://www.investopedia.com/terms/p/paintingthetape.asp.

enough FFB inventory to serve as a dealer in the FFB market. Changes in prevailing interest rates and other factors can affect the value of FFBs held in a dealer's inventory, limiting the ability of smaller players to engage in large FFB trades or hold FFB inventory. In order to be a market maker in the secondary FFB market, much like the Defendants, one must have "a sufficiently large client base to get a good view of the flow of orders; the capacity to take on large principal positions; continuous access to multiple markets, including funding and hedging markets; the ability to manage risk, especially the risk of holding assets in inventory; and market expertise in providing competitive quotes for a range of securities."[11]

142.    These barriers to entry prevented non-cartel members from competing with Defendants' cartel on equal terms and luring customers by offering superior prices.

## VIII.    SIMILAR WRONGDOING IN OTHER MARKETS SUPPORTS THE PLAUSIBILITY OF DEFENDANTS' FFB CONSPIRACY

143.    Defendants' conduct in this case is consistent with similar manipulation, collusion, and other anticompetitive conduct recently uncovered in various financial markets.

144.    Many Defendants have been implicated in or found liable for price-fixing schemes involving other financial products and benchmarks, including FX rates, LIBOR/Euribor/Yen LIBOR/Swiss franc LIBOR, ISDAfix, SSA bonds, Mexican government bonds, and Swiss franc derivatives.

145.    Further, the methods employed to fix prices in these markets—communications between competing traders through telephone, electronic chatrooms, and instant messaging—are strikingly similar to those used by Defendants' FFBs traders as alleged here.

---

[11] https://www.bis.org/publ/qtrpdf/r_qt1503i.pdf.

146. These findings further support the conspiracy alleged in this Complaint because they demonstrate that each Defendant used deficient compliance and oversight systems in their sales and trading businesses during the Class Period.

### a. FX Rates

147. Multiple Defendants here failed to control or detect rampant misconduct amongst their trading staff in the foreign exchange market. These failures allowed traders to fix bid-ask spreads, coordinate trading strategies with competitors to manipulate benchmark prices, and share confidential customer order information and proprietary information on trading positions with competitors in group chat rooms with names like "The Cartel." Defendants' deficient oversight and controls allowed this anticompetitive conduct to persist undetected for years during the Class Period. The DOJ's Antitrust Division, the same regulatory office presently investigating Defendants' collusive conduct in the FFB market, has obtained guilty pleas against the following corporate parents of Defendants in this case for failing to adequately monitor anticompetitive conduct in their subsidiaries' trading businesses: Citicorp. (a wholly owned, direct subsidiary of Citigroup Inc., the parent company of Defendant CGMI), Barclays PLC (the corporate parent of Defendants Barclays Bank PLC and BCI), and JPMorgan Chase & Co. (the corporate parent of JP MNA and JPMS) for operating inadequate oversight measures that allowed trading and sales staff to engage in a years' long conspiracy to fix FX prices during the Class Period. BNP Paribas USA Inc. (a subsidiary of Defendant BNPP SA) has also pled guilty to the DOJ and agreed to a $90 million fine. Defendant CS AG has also been charged with engaging in "anti-competitive practices" by the European Commission. CS AG, DB AG, and Goldman Sachs Group, Inc., the parent company of Goldman Sachs, have also entered into

Consent Orders with the New York State Department of Financial Services regarding their FX trading.

148.    Defendants in the FX conspiracy were fined over $10 billion by various enforcers throughout the world stemming from the banks' conspiracy. The following graph provides the various fines from and settlements with various enforcers in the United States (Department of Justice ("DOJ"), Commodity Futures Trading Commission ("CFTC"), Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board ("FRB"), and New York Department of Financial Services ("NYDFS")), Brazil (CADE), South Africa (SACC), Switzerland (FINMA), and the United Kingdom (FCA), to date in connection with their manipulation.[12]



149.    Moreover, several Defendants (or their subsidiaries) were also named as defendants in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.), where plaintiffs allege that defendants fixed the bid-ask spreads on FX transactions quoted to customers. Defendant banks' FX traders participated in several electronic chatrooms to discuss and coordinate their FX trading strategies and price-fixing conspiracy.

---

[12] http://www.investigationsandregulatoryadvice.com/is-the-trump-administration-charting-a-new-course-away-from-the-duplicative-fines-of-the-financial-crisis/.

### b.  LIBOR/Euribor/Yen LIBOR/Swiss franc LIBOR

150.    Government investigations and civil lawsuits have revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (U.S. Dollar LIBOR, Euribor, Yen LIBOR, Swiss franc LIBOR) during the Class Period. These investigations have led to dozens of fines and settlements for price fixing by the following corporate parents of Defendants here who failed to detect and prevent anticompetitive conduct by trading and sales staff within their subsidiaries: Barclays PLC, Bank of America Corp., Deutsche Bank AG (the corporate parent of Defendant DB Securities), UBS AG, JPMorgan Chase & Co., and Citigroup Inc. Regulators found that trading staff within these banks engaged in widespread misconduct during the Class Period, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

### c.  ISDAfix

151.    DB Securities, JP MNA, BNP Securities, BANA, Citibank, N.A. (a wholly owned subsidiary of Defendant Citigroup Inc.), Goldman Sachs, Barclays Bank PLC, and BCI for operating deficient compliance and oversight functions that allowed traders to systematically manipulate the U.S. dollar ISDAfix benchmark during the Class Period to boost trading profits.

### d.  SSA Bonds

152.    A DOJ investigation into price-fixing in the sub-sovereign and supranational agency ("SSA") bond market became public in December of 2015. It quickly prompted simultaneous cartel investigations by the UK Financial Conduct Authority, the European Commission, and the filing of private lawsuits. The private civil action, originally filed in May 2016, was amended in April 2017 to include 10 banks (originally filed against five) and hundreds

of redacted chats and transcripts that demonstrated that these banks failed to oversee collusive communications by trading and sales staffs in their bond businesses.

### e. Mexican Government Bonds

153.   The Mexican antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), announced in April 2017 that it uncovered evidence of anticompetitive conduct among dealers in the Mexican Government Bond ("MGB") market, including subsidiaries of Defendants Barclays Bank PLC, Citigroup Inc., JPMorgan Chase & Co., and Bank of America Corp. At least one bank was accepted into its cartel leniency program after admitting to participation in a conspiracy to fix Mexican Government Bond prices.

### f. Swiss Franc Interest Rate Derivatives

154.   The European Commission fined UBS AG, JPMorgan Chase & Co., and CS AG a total of €32.3 million euros for conspiring to fix bid-ask spreads in the market for interest rate derivatives denominated in Swiss francs. The Swiss franc interest rate derivatives conspiracy operated similarly to the conspiracy alleged in this Complaint and involved an agreement among horizontal competitors in the OTC market for derivatives to charge inflated bid-ask spreads to customers. These Defendants failed to detect and deter collusive communications among traders at these banks.

## IX.   ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

155.   Plaintiff and members of the Class sold and purchased hundreds of millions, if not billions, of dollars' worth of FFBs directly to and from Defendants in the United States. Defendants' unlawful price manipulation of FFBs deprived Plaintiff and members of the Class of a competitive and transparent marketplace free from collusion.

156.   Defendants have also harmed investors by artificially inflating the cost of their FFB transactions—either by inflating the bid price or depressing ask price. In doing so,

Defendants were able to extract supracompetitive profits from their dealings with Plaintiff and the Class. Absent Defendants' conspiracy, Plaintiff and the Class would have paid less money for their FFB purchases and would have received more money for their FFB sales.

157.    Accordingly, Defendants' anticompetitive conduct has injured investors in the United States, including Plaintiff and members of the Class in their business or property.

## X.    CLASS ACTION ALLEGATIONS

158.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who sold or purchased FFBs in the United States directly to or from Defendants from at least as early as January 1, 2009 through April 27, 2014 (the "Class Period").
>
> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

159.    Plaintiff believes that there are thousands of Class members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

160.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)    Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for FFBs in violation of the Sherman Act;

(b)    The identity of the participants in the conspiracy;

(c)    The duration of the conspiracy;

(d)    The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)     Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)     Whether Defendants fraudulently concealed the conspiracy's existence from Plaintiff and the Class; and

(g)     The appropriate measure of damages or restitution owed to Plaintiff and the Class.

161.    Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and Class members sustained damages arising out of Defendants' common course of conduct in violation of the law as described in this Complaint. The injuries and damages of each Class member were directly caused by Defendants' wrongful conduct.

162.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

163.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications.

164.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

165.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual

actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants, Class members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## XI.   PLAINTIFF'S CLAIMS ARE TIMELY

166.   The statutes of limitations governing Plaintiff's claims were tolled under the doctrine of fraudulent concealment until at least June 2018, when it was revealed that the DOJ Antitrust Division was investigating price-fixing in the market for FFBs. The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

167.   Defendants actively concealed their violations of law from Plaintiff and the Class by, *inter alia*, (i) relying on non-public forms of communication, such as private electronic messages and telephone calls; (ii) implicitly representing that the FFB pricing quotes Defendants supplied to Plaintiff and the Class were the product of honest competition and not fixed by a conspiracy; and (iii) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust  laws. Below is a list of non-exhaustive examples of such statements that each Defendant published during the Class Period:

168.   Barclays PLC, reporting on behalf of Barclays Bank PLC and BCI, reported in its 2010 Annual Report that it "operate[s] a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations." Barclays PLC claimed that it

"acknowledges that free and fair competition is good for business and customers and clients, driving innovation and improvements in service provision."

169.   Bank of America Corporation, reporting on behalf of BANA and Merrill Lynch, wrote in its 2010 Annual Report that it operated a program "consistently applied across the Corporation . . . to manage compliance risk." It also reported that it maintained an independent "Corporate Audit function" to "provide reasonable assurance" that "employees' actions are in compliance with . . . applicable laws and regulations." It further claimed that it emphasized a "culture of compliance" across the organization, including at BANA and Merrill Lynch.

170.   Citigroup Inc. implemented a "Citi Code of Conduct" during and after the Class Period. The Citi Code of Conduct applied to all entities affiliated with Citigroup Inc., including CGMI, and stated that Citigroup Inc. and its affiliates were "committed to promoting free and competitive markets." In its 2010 Annual Report, Citigroup Inc. claimed that it "monitor[ed] and control[led]" employee conduct, which included employees of CGMI, through "compliance and legal reporting systems, internal controls, management review processes and other mechanisms."

171.   Credit Suisse Group AG, reporting on behalf of CS AG and CS Securities, boasted that it had developed a "strong compliance culture" during the Class Period. It wrote in its 2010 Annual Report that it continued to "proactive[ly] develop[] [its] compliance framework [to] position[ it] well to respond to evolving regulation in the markets in which [it] operate[s]." Credit Suisse Group AG also emphasized that its "compensations practices and plans . . . are consistent with and promote effective risk management practices as well as [its] compliance and control culture." It published an updated Code of Conduct in 2010 "to place a greater emphasis on the values and professional standards underpinning our control and compliance."

172.    DB AG, which reports on behalf of DB Securities, wrote in its 2010 Annual Report that it maintained a "Regional Management" group responsible for both local and corporate-wide "compliance with regulatory and control requirements." DB AG also represented that it was "in compliance with the German laws that are applicable to [its] business in all material aspects." Price-fixing agreements among horizontal competitors are prohibited under German law.

173.    Goldman Sachs Group Inc., which reports on behalf of Goldman Sachs, wrote in its 2010 Annual Report that it "monitor[s] and control[s] [its] risk exposure through a risk and control framework encompassing a variety of separate but complementary financial, credit, operational, compliance and legal reporting systems, internal controls, management review processes and other mechanisms." Goldman Sachs Group Inc. further claimed that "compliance with the law is the minimum standard to which we hold ourselves." Goldman Sachs Group Inc. also published a Code of Conduct during the Class Period that purportedly required "fair and ethical competition" by its employees, including employees of Goldman Sachs, and prohibited "manipulation" and "unfair dealing practice[s]."

174.    JPMorgan Chase & Co. published a "Code of Conduct" during the Class Period that applied to "all its direct and indirect subsidiaries." In the Code of Conduct, JPMorgan Chase & Co. claimed that it was "committed to complying with the letter and spirit of applicable competition laws wherever we do business." JPMorgan Chase & Co., which reports on behalf of JPM NA and JPMS, reported in its 2010 Annual Report that its Audit Committee "reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes." It further assured investors

that it "has established policies and procedures, and has in place various oversight functions, intended to promote the Firm's culture of 'doing the right thing.'"

175.    First Tennessee and FTN Financial reported under First Horizon's 2010 Annual Report that First Horizon had "[m]anagement processes, structure, and policies are designed to help ensure compliance with laws and regulations as well as provide organizational clarity for authority, decision-making, and accountability." First Horizon also reported having a risk management team that "monitor[s] business practices in relation to those [establish[ed] appropriate operating standards." It also wrote in its Code of Conduct that it prohibited "manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing practice."

176.    BNP Paribas SA, which reports on behalf of subsidiaries including BNP Securities, wrote in its 2010 Annual Report that it had in place a "complex internal control governance structure involving the Board of Directors, through various Committees," to purportedly ensure an effective internal compliance system. BNP Paribas SA published a 2011 Code of Conduct where it wrote that it prohibited "market manipulation" and required "natural[] compl[iance] with the laws, regulations and professional standards" from its employees, including employees of BNP Securities.

177.    UBS AG, which reports on behalf of UBS Securities, boasted in its 2010 Annual Report that it "pursue[s] the highest levels of compliance through extensive employee training and investment in risk management processes and standards." Additionally, it emphasized that it evaluated its employees "base[d]" in part on "whether they . . . operate with a high level of integrity and in compliance with UBS policies." UBS Securities also claimed in its global Code

of Business Conduct and Ethics that it was "committed to . . . complying with relevant laws, rules and regulations, including applicable antitrust and competition laws."

178.    Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to fix prices in the FFB market, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiff could not have learned of Defendants' anticompetitive conduct prior to June 2018, when confidential sources revealed that the DOJ Antitrust Division was investigating dealers for fixing the prices of FFBs purchased and sold by investors.

179.    Because of Defendants' fraudulent concealment, Plaintiff and the Class were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until June 2018, when the DOJ's price-fixing investigation was revealed publicly for the first time. Accordingly, Plaintiff asserts that the applicable statutes of limitations on Plaintiff's claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

## XII.    CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**Contract, Combination, or Conspiracy in Restraint of Trade**

180.    Plaintiff incorporates the preceding paragraphs by reference.

181.    Defendants entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

182.    During the Class Period, Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating FFB prices sold in the United States and elsewhere.

183.    This conspiracy to manipulate FFB prices caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive FFB prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

184.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the FFB market. There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

185.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

186.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged in this Complaint.

## COUNT II

### Unjust Enrichment in Violation of the Common Law

187.    Plaintiff incorporates by reference and re-allege the preceding allegations, as though fully set forth herein.

188.    Plaintiff and Class members transacted in FFBs during the Class Period directly with Defendants Barclays Capital, Inc.; Merrill Lynch, Pierce, Fenner, & Smith, Inc.; BNP

Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse AG; Credit Suisse

Securities (USA) LLC; Deutsche Bank Securities Inc.; First Tennessee Bank, N.A., Goldman

Sachs & Co. LLC; JPMorgan Chase Bank, National Association; J. P. Morgan Securities LLC;

and UBS Securities LLC. These transactions were supposed to be priced based on competitive

market forces and reflect honest competition by the Defendants.

189.    However, as alleged above, rather than competing honestly and aggressively with

each other, Defendants colluded to fix the prices charged or remitted to Plaintiff and the Class in

purchases and sales of FFBs.

190.    Defendants' collusion enabled them to collect supracompetitive profits on every

transaction of FFBs with Plaintiff and the Class. At the same time, it caused Plaintiff and the

Class to pay more (in the case of FFB purchases) and receive less (in the case of FFB sales) on

their FFB transactions with Defendants.

191.    It is unjust and inequitable for Defendants to have enriched themselves in this

manner at the expense of Plaintiff and the Class, and equity and good conscience require the

Defendants to make restitution.

192.    Plaintiff and the Class therefore seek restoration of the monies of which they were

unfairly and unlawfully deprived as described in this Complaint.

## XIII.  **RELIEF REQUESTED**

Accordingly, Plaintiff, on behalf of itself and the proposed Class, respectfully requests:

(A)    That the Court certifies this lawsuit as a class action under Rule 23(a) and (b)(3)

of the Federal Rules of Civil Procedure, that Plaintiff be designated as a class representative, and

that Plaintiff's counsel be appointed as class counsel;

(B)    That the unlawful conduct alleged herein be adjudged and decreed to be in

violation of Section 1 of the Sherman Act;

(C)     That the Court awards Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

(D)     That the Court awards Plaintiff and the Class restitution under common law unjust enrichment;

(E)     That the Court awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(F)     That the Court awards such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIV.  **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.


Dated: April 5, 2019                           Respectfully submitted,

*/s/ Gregory S. Asciolla*
GREGORY S. ASCIOLLA
JAY L. HIMES
ROBIN A. VAN DER MEULEN
DOMENICO MINERVA
MATTHEW J. PEREZ
LARA GOLDSTONE (*pro hac vice* pending)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email:
gasciolla@labaton.com
jhimes@labaton.com
rvandermeulen@labaton.com
dminerva@labaton.com
mperez@labaton.com
lgoldstone@labaton.com

*Counsel for Plaintiff Oklahoma Police Pension
and Retirement System and the Proposed Class*